**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 18a0162n.06

Case Nos. 17-5077/5097/5118/119

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED**<br>Mar 28, 2018<br>DEBORAH S. HUNT, Clerk |
|  | ) |  |
| Plaintiff-Appellee, | ) |  |
|  | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
|  | ) | COURT FOR THE MIDDLE |
| BRIAN MERRIWEATHER, CHARLES | ) | DISTRICT OF TENNESSEE |
| REEVES III, LLOYD MONTGOMERY, and | ) |  |
| DOMINIQUE LUCAS | ) |  |
|  |  |  |
| Defendants-Appellants. | | **O P I N I O N** |

BEFORE: MOORE, COOK, and McKEAGUE, Circuit Judges.

**McKEAGUE, Circuit Judge.** Brian Merriweather, Charles Reeves III, Lloyd Montgomery, and Dominique Lucas were all indicted for their connection to an opiate distribution conspiracy based in Clarksville, Tennessee. Merriweather was convicted at trial, the other three pled guilty, and their cases were consolidated on appeal. Merriweather challenges the denial of his pre-trial motion to suppress and motion to dismiss and argues the evidence was insufficient to sustain his convictions. Reeves, Montgomery, and Lucas raise a medley of sentencing challenges. For the reasons set forth below, we reject all claims by Merriweather and Reeves and **AFFIRM** their convictions and sentences, but we **VACATE** Montgomery's and Lucas's sentences and **REMAND** to the district court for resentencing.

**I**

The following is a broad overview of the facts that underpin the fourteen issues in this consolidated appeal. Because many of the claims presented here involve details relevant only to a specific defendant, certain facts are more fully set forth in the analysis of those issues.

*Charges and Adjudication.* On October 28, 2015, a federal grand jury indicted Lloyd Montgomery, Brian Merriweather, and Dominique Lucas. The indictment charged that the three had been members of a conspiracy to distribute controlled substances from February 2013 to October 2015, in violation of 21 U.S.C. §§ 846 and 841(a)(1). Montgomery was personally charged with two counts of illegally possessing a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924, and 12 counts of unlawfully distributing controlled substances, in violation of 21 U.S.C. § 841(a)(1). Merriweather and Lucas were each also charged with two counts of unlawfully distributing controlled substances, in violation of 21 U.S.C. § 841(a)(1). In the same indictment, Charles Reeves was charged with one count of illegally possessing a firearm, in violation of §§ 922(g)(1) and 924. The charges against Montgomery, Merriweather, and Lucas arose from their roles in a prescription pill distribution conspiracy in Clarksville, Tennessee. Reeves was roped into the proceedings after Montgomery sent a confidential informant to Reeves to purchase a rifle.

In December 2015, the government offered plea deals to the defendants. The defendants declined the offers about a month later. Subsequently, the government filed notices under 21 U.S.C. § 851 alleging prior convictions for a felony drug offense, the effect of which was to raise the statutory maximum sentence under 21 U.S.C. § 841(b)(1)(C), and also raise the recommended career-offender sentence under U.S.S.G. § 4B1.1(b)(2). The government then re-extended a plea offer to each of Montgomery, Merriweather, and Lucas, offering to withdraw the

§ 851 enhancements. The defendants again declined the offer and instead filed a joint motion to dismiss for selective prosecution on the basis that the government had declined to prosecute similarly situated white drug dealers.

On July 11, 2016, the district court denied the joint motion to dismiss. Two weeks later, Lucas entered a guilty plea. Montgomery did the same on August 3, 2016. Reeves, meanwhile, would enter his guilty plea later, in October 2016. But Merriweather held out. And relevant to this appeal, on August 8, 2016, the district court denied Merriweather's motion to suppress evidence recovered from a cell phone that allegedly belonged to him.

Merriweather's trial began the next day. At trial, the government presented evidence including testimony from two witnesses as to the scope of the narcotics conspiracy and Merriweather's involvement, still images from a police-controlled narcotics purchase in which Merriweather was identified, video and audio recordings, and text messages and phone calls relating to the conspiracy that were extracted from a phone believed to be Merriweather's. Merriweather was ultimately convicted on all counts and sentenced to 216 months' imprisonment. The evidence that emerged during the case also featured prominently in the sentencings of Merriweather's co-conspirators, Montgomery and Lucas.

A primary government witness was Anthony Seay, a Clarksville resident who became addicted to prescription pills following the use of painkillers related to a back injury. Prior to cooperating with the investigation of Montgomery's drug network, police executed a search warrant on Seay's home. Seay confirmed that at that time, he and others had been using his home for drug-related purposes, including both using and selling. Following that, Seay elected to cooperate with police in an effort to avoid prosecution for his own drug-related offenses. Seay was offered a cooperation agreement and eventually a non-prosecution agreement, both of which

he accepted, in exchange for his willingness to provide information pertaining to Montgomery's network of pill distributors, participate in police-controlled purchases, and eventually testify truthfully at trial.

Seay testified to the overall pervasiveness of the narcotics distribution scheme and the various ways in which Montgomery and his associates would sell and obtain prescription pills. Seay began purchasing prescription pills from Montgomery approximately eight years ago, often making multiple purchases per week. Seay purchased pills from Montgomery in various locations throughout Clarksville—gas stations, shopping centers, and a house known as "Stacker." Through these encounters, Seay became familiar with Montgomery, his associates, and their pill-distribution network.

Seay explained that the Stacker house was well-known to those seeking narcotics and was essentially open for business twenty-four hours per day. When Montgomery was personally unavailable, he would often send Seay and other customers to the Stacker house to purchase pills from his associates, most often Lucas. During those many trips to the Stacker house, Seay said he would at times see and speak with Merriweather. Although Seay testified on cross examination that he never purchased narcotics directly from Merriweather at the Stacker house, two police officers identified Merriweather as the individual in the videos of the controlled buys with Seay.

The government's second cooperating witness was Raymond Poindexter. Poindexter also testified to the scope of the prescription pill distribution network and to Merriweather's direct involvement. Poindexter referred to himself as a "booster"—he would steal small-ticket items from stores and exchange the stolen property for narcotics to feed his addiction. Poindexter acknowledged that he often traded these stolen items to Montgomery at the Stacker

house, and that Merriweather was present "[a] few times." Poindexter's criminal history includes multiple convictions for theft relating to these "boostings."

When asked about the level of narcotics activity occurring at the Stacker house, Poindexter explained that there "was a lot of stuff going on" and confirmed that drug activity occurred both day and night. Although Poindexter dealt exclusively with Montgomery, Poindexter said that he observed Merriweather selling narcotics out of the Stacker house to other customers on multiple occasions. Supporting Seay's testimony, Poindexter observed that it was not uncommon for Montgomery to share customers with his associates; those that entered the Stacker house seeking pills from Montgomery would occasionally purchase instead from others.

To substantiate the testimony of Seay and Poindexter, the government adduced at trial two additional pieces of evidence: images from Seay's controlled purchases that demonstrated Merriweather's presence during, and participation in, the two controlled purchases; and text messages and phone calls between Merriweather and Montgomery that the government says are evidence of frequent narcotics-related communications between the two individuals throughout the conspiracy.

Beyond the evidence in Merriweather's trial, some additional facts are relevant to Montgomery's and Reeves's sentencing challenges. In addition to the two controlled purchases emphasized in Merriweather's trial, the government conducted at least nine other controlled purchases involving Montgomery. While Seay usually purchased directly from Montgomery, Montgomery twice involved Merriweather in the purchases—the same two discussed above—and once sent Seay to Lucas for pills.

And in another of these purchases, Montgomery directed Seay—who had asked about buying a rifle—to a nearby house where Seay met Reeves. Seay and Reeves briefly negotiated a

price for a rifle, before settling on $160. Reeves then led Seay outside his house and into his backyard, where a purple Jaguar car was parked. Reeves opened the trunk, and in it was an Enfield .303 caliber rifle with a mounted scope and magazine, all concealed in a pair of jeans. Seay gave Reeves the agreed-on $160.

*Sentencing.* All four defendants were sentenced on January 4, 2017. At the sentencing hearing, the government provided additional evidence regarding the scope of the conspiracy, including law enforcement interviews with Seay and Poindexter and Poindexter's grand jury testimony, in which Poindexter emphasized that all three of Montgomery, Merriweather, and Lucas would sell pills from the Stacker house. The defendants, for their part, lodged various written objections to their respective presentence reports and filed sentencing memoranda.

At the sentencing hearing, the court ruled on the PSR objections, established the appropriate Guidelines range for each defendant, and heard argument from defense and government counsel regarding appropriate sentences. The court sentenced Montgomery, Merriweather, Lucas, and Reeves to terms of imprisonment of 240 months, 216 months, 180 months, and 60 months, respectively. These sentences were all below the recommended Guidelines range. All four defendants appealed.

## II

### A. Brian Merriweather

#### 1. Motion to Suppress

Merriweather first asserts that the district court erred in denying his motion to suppress all evidence flowing from the government's search of his cell phone. The warrant never should have issued, Merriweather says, because the affidavit in support of it was inadequate to show probable cause. The government disputes that the affidavit was lacking, but argues that even if it

was, the affidavit was ample enough for officers to reasonably rely on the warrant under the good-faith exception.

### a. Standard of Review

In suppression cases, this court asks "whether the magistrate had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited." *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991) (citation omitted). Said another way, "[P]robable cause exists 'when there is a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place.'" *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001) (quoting *Davidson,* 936 F.2d at 859). In determining whether a warrant is supported by probable cause, the court analyzes the sufficiency of the affidavit and warrant "in a commonsense and realistic fashion," not a "hypertechnical" one. *United States v. Ventresca*, 380 U.S. 102, 109 (1965). "Moreover, review of an affidavit and search warrant should rely on a totality of the circumstances determination, rather than a line-by-line scrutiny." *Greene*, 250 F.3d at 479 (internal quotation marks omitted).

Yet even if the warrant affidavit failed to provide probable cause, evidence should not be suppressed if it is "obtained in objectively reasonable reliance" on the defective warrant. *United States v. Leon*, 468 U.S. 897, 922 (1984). This so-called "good-faith exception" to exclusion applies "unless the evidence is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *United States v. Watkins*, 179 F.3d 489, 494 (6th Cir. 1999); *see United States v. Silvey*, 393 F. App'x 301, 305 (6th Cir. 2010) (courts should deny the good-faith exception when "affidavit [is] so barren of detail that a reasonable officer would have known that [it] did not meet constitutional standards").

### b. Analysis

We decide this case on *Leon* grounds. Even if the warrant here never should have issued—a question we express no opinion on—the affidavit here is "not so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Watkins*, 179 F.3d at 494. The affidavit submitted by Agent Tracy in support of the warrant contains the following attestations: that a criminal informant (CI) had twice completed a controlled purchase of oxymorphone from Merriweather, that both controlled purchases were organized through cell phone communication (between the CI and Merriweather's co-defendant, Lloyd Montgomery), that the cell phone at issue was found in the car Merriweather was driving immediately before his arrest, and that the same car also contained what appeared to be four oxymorphone pills and cocaine rocks. In addition to those case-specific allegations, the affiant stated that in his training and experience, drug dealers use cell phones to coordinate with conspirators, customers, and suppliers.

Reading these allegations together, in a "totality of the circumstances determination, rather than a line-by-line scrutiny," *Greene*, 250 F.3d at 479, an officer could reasonably conclude that the affidavit provided probable cause to believe Merriweather's cell phone contained incriminating evidence. It is particularly significant that the CI arranged his first controlled purchase of oxymorphone from Merriweather through cell phone communication with Montgomery.[1] While that does not directly implicate Merriweather's cell phone, an officer could reasonably infer that (1) Montgomery then arranged with Merriweather via cell phone where the latter was to meet the CI and (2) more generally that members of Montgomery's

---

[1] According to the affidavit, both Montgomery and Merriweather were present during the second controlled purchase, which admittedly lessens the likelihood that Montgomery communicated via cell phone with Merriweather to organize this particular deal.

distribution network (and Merriweather is one such member) routinely use cell phones to facilitate their illicit business. Importantly, our precedent makes clear that any assessment of an officer's good-faith reliance must account for the inferences he may draw from the affidavit. *United States v. White*, 874 F.3d 490, 500 (6th Cir. 2017) ("[R]easonable inferences that are not sufficient to sustain probable cause in the first place may suffice to save the ensuing search as objectively reasonable."). Moreover, while rote recitations about officers' "training and experience" might in some instances ring hollow, *see United States v. Schultz*, 14 F.3d 1093, 1097 (6th Cir.1994), such a claim is consistent with common sense in this case: it seems obvious there is a good chance Merriweather at times used his cell phone to carry out the goals of this distribution conspiracy, given the manner in which the controlled purchases were coordinated and the further fact that he had his phone with him as he traveled around with drugs.

Merriweather's initial brief does not address the good-faith exception, and he didn't file a reply brief. In any event, the affidavit here "stands in stark contrast to prototypical bare-bones affidavits" in other cases. *United States v. White*, 874 F.3d 490, 506 (6th Cir. 2017). Take, for example, the warrant application in *Nathanson v. United States*, 290 U.S. 41, 44 (1933), in which an officer swore that "he has cause to suspect and does believe" that illegal liquor would be found in Nathanson's home. Or consider the affiants' claim in *Aguilar v. State of Tex.*, 378 U.S. 108, 109 (1964), that they had "received reliable information from a credible person" that drugs could be found at Aguilar's home. In both *Nathanson* and *Aguilar*, archetypal examples of bare-bones affidavits, the officer "ask[ed] the magistrate to simply take his word for it." *White*, 874 F.3d at 499. Not so here. Instead, the affidavit offers several factual allegations that, even if insufficient in isolation and circumstantial in nature, render the officer's reliance on the warrant objectively reasonable.

The non-binding district court case Merriweather cites in his brief is also easily distinguished. *See United States v. Ramirez*, 180 F. Supp. 3d 491 (W.D. Ky. April 12, 2016). In *Ramirez*, the district court held both that the affidavit supporting the search warrant for Ramirez's phone was insufficient to show probable cause and that the good-faith exception did not apply. *Id.* at 495-96. That was for very good reasons—but reasons that are absent in this case. The affidavit in *Ramirez* relied only on (1) the fact that Ramirez had a cell phone on him during his arrest for a drug-related conspiracy and (2) the affiant's claim that his training and experience suggest such conspiracies are often facilitated by cell phones. *Id.* at 495. While the affidavit established that Ramirez likely *owned* the phone, the district court held that it was nevertheless "insufficient by itself to establish a nexus between the cell phone and any alleged drug activity," *id.*, and that "[a]n objectively reasonable law enforcement officer would have recognized" the deficiency, *id.* at 496. But the *Ramirez* affidavit did not, as the instant one did, allege that cell phones were used to facilitate two drugs buys from Merriweather or that the particular cell phone at issue was found in a vehicle containing apparent oxymorphone, the very drugs involved in the conspiracy. Those facts take this case outside of *Ramirez*'s ambit—and confirm that an officer could reasonably rely on the affidavit in searching Merriweather's cell phone.

We affirm the district court's denial of Merriweather's motion to suppress.

### 2. Motion to Dismiss for Selective Prosecution

Merriweather next contends that the trial court erred in denying his motion to dismiss for selective prosecution without granting him an evidentiary hearing. A selective-prosecution claim is an assertion that the prosecutor has brought charges based on some factor prohibited by the Constitution; the claim is thus rooted in equal protection principles. *See Loza v. Mitchell*, 766

F.3d 466, 495 (6th Cir. 2014); *United States v. Armstrong*, 517 U.S. 456, 463 (1996). Here, Merriweather alleges that race—his status as an African American—was an improper motivating factor in the government's decision to prosecute, and that he at least did enough to substantiate this claim to warrant further discovery and an evidentiary hearing. To be sure, it is unclear whether Merriweather is challenging the district court's denial of his motion to dismiss (a substantive ruling) *and* the denial of an evidentiary hearing with respect to his motion (a procedural ruling), or is instead challenging only the latter decision. But answering his procedural challenge also resolves the substantive one—for if Merriweather did not do enough to warrant further discovery, it is because his substantive claim had little hope of succeeding to begin with. We therefore focus our review on that issue.

### a.    Standard of Review

Merriweather and the government talk past one another on what standard should govern our review. Merriweather says that, since he is raising a "constitutional challenge to [his] prosecution," our review is de novo—except to the extent the district court's denial of his motion to dismiss was premised on factual findings, in which case we review for clear error. But he doesn't say which ought to apply here. The government doesn't even mention either of those standards; it instead argues that the district court's decision to deny a motion to dismiss an indictment is ordinarily reviewed for an abuse of discretion. The government also suggests Merriweather waived this challenge by failing to object to the purported lack of process at the motion to dismiss stage and pleads for plain error review.

The parties can be forgiven for their confusion, since this court has admitted its case law on what standard should govern in this situation is "somewhat unclear." *United States v. Grenier*, 513 F.3d 632, 636 (6th Cir. 2008). That confusion is compounded here by the fact that

Merriweather's challenge has a substantive and procedural component, and by the fact that the district court did not issue a reasoned written decision (making it difficult to tell whether its decision was based on factual findings or purely legal grounds). Notwithstanding this confusion, we apply either clear-error or abuse-of-discretion review. "When reviewing a district court's disposition of a motion to dismiss an indictment based on findings of fact, we have generally applied either an abuse of discretion standard or a clear error standard." *United States v. Grenier*, 513 F.3d 632, 635-36 (6th Cir. 2008); *see United States v. Poole*, 407 F.3d 767, 772 (6th Cir. 2005) (noting that the court has alternately employed both standards). The district court's decision here was almost certainly based on factual findings and credibility determinations, especially with respect to the reliability of Merriweather's proffered statistical evidence and the reliability of Brandy Bourne's sworn testimony, both of which undergirded Merriweather's selective-prosecution theory. It is also telling that the government's argument for why the motion should be denied required the court to make credibility determinations and factual findings. Under either clear-error or abuse-of-discretion review, we can reverse the district court only if our review yields the "definite and firm conviction" that the district court clearly erred. *Compare Penney v. United States*, 870 F.3d 459, 461 (6th Cir. 2017) (using phrase to describe abuse of discretion), *with Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985) (using same to describe clear error).

### b.    Analysis

A "selective-prosecution claim asks a court to exercise judicial power over a special province of the Executive." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citation and internal quotation marks omitted). Because federal law enforcement "retain[s] broad discretion to enforce the Nation's criminal laws," a "presumption of regularity supports their prosecutorial

decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their duties." *Id.* (citation and internal quotation marks omitted). And "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute . . . generally rests entirely in his discretion." *Id.* (citation and quotation marks omitted).

The Constitution, however, imposes outer bounds on that discretion. "One of these constraints, imposed by the equal protection component of the Due Process Clause of the Fifth Amendment, is that the decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.* (citations and internal quotation marks omitted). A defendant alleging that sort of selective prosecution must "demonstrate that the administration of a criminal law is directed so exclusively against a particular class of persons . . . with a mind so unequal and oppressive that the system of prosecution amounts to a practical denial of equal protection of the law." *Id.* at 464-65. And he must do so by proffering "clear evidence" that the prosecutor's policy had both a discriminatory purpose and effect. *Id.* at 465. As for the purpose requirement, a defendant "must prove that the decisionmakers in *his* case acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987). To satisfy the effect element, a defendant "must show that similarly situated individuals of a different race were not prosecuted." *Armstrong*, 517 U.S. at 465.

Why this high bar? For starters, this deferential review seeks to accommodate two fundamental yet sometimes-competing constitutional principles—honoring the separation of powers by giving due deference to executive law enforcement discretion, while at the same time ensuring that citizens targeted for constitutionally impermissible reasons can seek recourse. *See id.* at 464. It also "rests in part" on the Court's recognition that courts are poorly positioned to

second-guess the decision whether and whom to prosecute. *Wayte v. United States*, 470 U.S. 598, 607 (1985) ("Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake."). And finally, the rigorous standard "stems from a concern" that litigating selective-prosecution claims might "unnecessarily impair the performance of a core executive function," *Armstrong*, 517 U.S. at 465, by "subjecting the prosecutor's motives and decisionmaking to outside inquiry" and "revealing the Government's enforcement policy," *Wayte*, 470 U.S. at 607.

Because even discovery seeking to support a selective-prosecution claim risks doing the same, courts should be hesitant to grant discovery without first assessing the case's strength. *Armstrong*, 517 U.S. at 468 (noting that discovery may "divert prosecutors' resources [or] disclose the Government's prosecutorial strategy."). The justifications for a "rigorous standard for the elements of a selective-prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such a claim." *Id.* Specifically, a defendant pressing such a claim must make a "credible showing" of both discriminatory effect and discriminatory intent. *Id.* at 468, 470. The question here, then, is whether the district court committed a clear error in judgment by concluding that Merriweather failed to make such a "credible showing."

We think the answer is no. Take, first, the discriminatory effect prong. Here, Merriweather must make a credible showing that similarly situated criminals of a different race were not prosecuted. *Id.* at 465, 470. To do so, Merriweather argues that white drug dealers, specifically Anthony Seay and his associates, were ignored by police. Merriweather relies on the testimony of Brandy Bourne to support this assertion. Bourne stated that authorities turned a

blind eye to Seay and his associates, all of whom were white, even though they participated in a distribution scheme similar to Montgomery's and potentially even more widespread.

Bourne's testimony is, however, severely compromised—by her bias as the girlfriend of one of the defendants (Montgomery, with whom she also has a child), by the inconsistencies between her motion-to-dismiss testimony and previous sworn statements she made to the government, and by what appear to be outright lies in her most recent testimony. Three particularly compromising details show the district court would commit neither clear error nor abuse its discretion by refusing to give much credit to Bourne's attestations. First, Bourne denied in her motion-to-dismiss testimony that she ever cooperated with the government against Montgomery. The government proved this was false by producing Bourne's cooperation agreement and receipts documenting payment for that cooperation. Second, the information Bourne provided to the government during that cooperation actually suggests the government had legitimate strategic reasons for focusing on Merriweather and his compatriots in this case— namely, that they were key players in a major drug distribution network led by Montgomery. And third, nearly all the white individuals Bourne identifies as having gotten off scot-free had, in fact, been prosecuted.[2] These realities deal fatal blows to both Bourne's credibility and the entire theory underlying Merriweather's selective-prosecution claim, especially with regard to the discriminatory effects prong.[3] Therefore, the district court did not clearly err in concluding that

---

[2] What's more, many of these defendants were prosecuted for drug-related offenses. And while Anthony Seay, who is at the center of Merriweather's argument, was not prosecuted for a drug offense, there is a good reason why he was not: he was working as an informant and cooperating witness for the prosecution, helping to build the cases against the conspirators in this case.

[3] Though we need not reach the intent prong of the analysis, we note that the evidence Merriweather offers to support that part of his claim suffers from the very shortcomings identified by the government in its brief: the data is unreliable, and even if taken at face value, does not show what Merriweather says it does—that prosecutors in the Middle District of

Merriweather failed to make a "credible showing" sufficient to justify further discovery intended to develop his claim.

### 3. Sufficiency of the Evidence

Merriweather also asserts that the evidence presented at trial was insufficient to justify the jury's guilty verdict on both the distribution and the conspiracy to distribute charges. As to the distribution charges, Merriweather questions the credibility of the witnesses testifying against him and claims that the video evidence allegedly showing his participation in one drug deal does not actually support that conclusion. As to the conspiracy charge, Merriweather says the cell phone text messages and call logs (which he suggests form the bedrock of the government's case) cannot be the basis for the jury verdict. That is because Merriweather's connection to the phone was never firmly established, the text messages relied on by the government came outside the dates of the conspiracy listed in the indictment, and the frequent calls between Montgomery and Merriweather owe to their familial relationship, not a drug conspiracy.

### a. Standard of Review

This court "will reverse a judgment for insufficiency of evidence only if, viewing the record as a whole, the judgment is not supported by substantial and competent evidence." *United States v. Taylor*, 800 F.3d 701, 711 (6th Cir. 2015). In determining whether "substantial and competent evidence" supported the judgment, this court must draw all reasonable inferences from the record in favor of the prosecution, and must avoid the temptation to weigh the evidence anew or assess the credibility of witnesses. *Id.* After doing so, if "*any* rational [jury] could have found the essential elements of the crime beyond a reasonable doubt," the judgment must be affirmed. *Id.*

---

Tennessee seek sentencing enhancements against black defendants at a greater rate than they do against white defendants.

###### b. Analysis

It makes sense to analyze the evidence relevant to each of the three counts independently, starting with the distribution and possession with intent to distribute offenses. To prove the distribution counts, the government had to prove that Merriweather "(1) knowingly or intentionally distribute[d] cocaine, and[] (2) at the time of such distribution the defendant knew that the substance" was a controlled substance. *United States v. Colon*, 268 F.3d 367, 376 (6th Cir. 2001). To prove the possession with intent to distribute counts, the government had to show that "(1) the defendant[] knowingly, (2) possessed a controlled substance, (3) with the intent to distribute." *United States v. Wettsain*, 618 F.3d 577, 585 (6th Cir. 2010).

*May 6 Distribution.* The evidence supporting this conviction is more than enough for this court to affirm. It includes: photographic evidence of a man, later identified as Merriweather, selling drugs to informant Anthony Seay; testimony by both Seay and Poindexter that Merriweather was frequently at the Stacker house, and that other individuals, Merriweather at times included, would commonly carry out drug deals for Montgomery when he was absent; and other circumstantial evidence tending to support the conviction, including the frequent cell phone communication between Montgomery and Merriweather.

Merriweather counters that the evidence was insufficient because Seay and Poindexter were wholly unreliable witnesses. As for Seay, Merriweather makes much of the fact that he never "point[ed] at Mr. Merriweather from the witness stand and [said], 'I bought pills from him on these dates.'" In addition, Merriweather points out that Seay testified he had never actually purchased pills from Merriweather. But as noted above, two other government witnesses were unequivocal in identifying Merriweather as the man involved in those controlled buys. The jury

was free to credit their testimony on the identification point more than Seay's. And Seay's failure to identify Merriweather does not negate the other evidence against Merriweather.

As for Poindexter, Merriweather says his testimony must be taken with a grain of salt, if not discounted entirely, since Poindexter also testified that he "would tell anyone what they wanted to hear to get a pill" and "had lied to courts before." This is, essentially, a plea for this court to make credibility determinations that are the proper province of the jury. *Taylor*, 800 F.3d at 711. Indeed, this is the very same credibility-attacking theory urged by Merriweather's counsel at trial. R. 234, Jury Trial Tr., PID 1663 (promising the jury they will hear from a witness who will "tell you the doggone sky was purple if you [were] going to give [him] a pill"). It was for the jury to decide whether, and to what extent, to credit Poindexter's testimony. *United States v. Bailey*, 444 U.S. 394, 414-15 (1980) ("It is for [jurors], generally, and not for appellate courts, to say that a particular witness spoke the truth or fabricated a cock-and-bull story."). And while Poindexter is no paragon of honesty, the jury had good reason credit his testimony that Merriweather sold drugs at the Stacker house, not the least of which was the video evidence of Merriweather's participation in two controlled drug buys.

*June 3 Distribution*. The analysis here is hardly different from that regarding the May 6 distribution charge. There is, however, one further argument by Merriweather that deserves discussion. He says that the video recording of this controlled buy is weak evidence of Merriweather's involvement in the transaction since the video "clearly showed Mr. Seay buying a pill from Lloyd Montgomery," not Merriweather. This is at best an incomplete characterization of what the video shows. The video more importantly shows Merriweather leading Seay into the Stacker house; Merriweather walking into the room where Montgomery was, then walking back out and asking Seay, "How much you paying?"; and Merriweather

stepping aside so that Seay can complete the transaction with Montgomery. From that evidence, the jury could readily conclude that Merriweather aided and abetted Montgomery in the sale and convict him accordingly.

*February 2013-October 2015 Conspiracy*. To prove the conspiracy charge, the government must show "(1) an agreement to violate drug laws . . . ; (2) knowledge and intent to join the conspiracy and (3) participation in the conspiracy." *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005). The government need not show "proof of a formal agreement"; a "tacit or material understanding among the parties" is enough. *Id.* (citation and internal quotation marks omitted). Whether a conspiracy exists can be shown by "circumstantial evidence that can reasonably be interpreted as participation in the common plan." *Id.* (citation omitted). Once a conspiracy's existence is established, "a defendant's connection to the conspiracy need only be slight" and "may be inferred from his conduct and established by circumstantial evidence." *Id.* (citation omitted).

Merriweather and the government spend a lot of time arguing about whether the cell phone evidence in this case was sufficient to support Merriweather's conspiracy conviction. But that gives the misimpression that the cell phone contact between Montgomery and Merriweather was all the jury had to go on. Merriweather, in particular, urges this view: "In regard to the conspiracy, *other than the evidence of Mr. Merriweather's presence at the home*, the Government used a cell phone it attributed to Mr. Merriweather." Merriweather's Br. at 17 (emphasis added). Merriweather thus attempts to undermine the quantity and quality of the evidence supporting the conspiracy conviction by conveniently overlooking the evidence underpinning his distribution convictions. He misleadingly suggests the government's only (or at least best) evidence of a conspiracy are the text messages and call logs taken from a cell phone

that, he says, the government never even proved belonged to him. But this overlooks the *strongest* evidence of Merriweather's role in the conspiracy—the testimony and video evidence suggesting he routinely sold drugs at the Stacker house, which all agree was controlled by Montgomery and served as the hub of his distribution network.

The evidence surrounding both controlled buys are particularly strong indicators of Merriweather's full-throated participation in a conspiracy with Montgomery. In the first buy, Seay communicated with Montgomery, who directed Seay to the Stacker house to consummate the transaction with one of his associates. And when Seay showed up to the house, it was Merriweather who completed the deal. That is powerful circumstantial evidence of a common plan between Montgomery and Merriweather to distribute drugs, and of Merriweather's participation in that plan. The second controlled buy is similarly damning for Merriweather. Here, the evidence shows that Merriweather directed Seay to Montgomery and that he relayed information concerning the prospective drug deal to Montgomery. What Merriweather tries to dismiss as merely "evidence of Mr. Merriweather's presence at the home" is instead critical evidence that goes to each of the three elements of a conspiracy offense. *See Martinez*, 430 F.3d at 330.

And even on the merits of the cell phone evidence dispute, the government appears to have the better of the argument. The cell phone evidence is not nearly as compromised and unhelpful to the government's case as Merriweather suggests. He first tries to argue that the evidence could not even establish Merriweather's ownership of the phone confiscated after his arrest. Though it is true the phone was found in a car registered to someone else, it is also true that Merriweather drove that car to the probation office, that he did so alone, and that a single phone was found in that car after Merriweather's arrest. On that cell phone, the government

discovered several of the text messages in which the sender calls himself, or is called by others, "B" or "Brian."[4]   A jury could easily conclude from this evidence that the phone was Merriweather's.

Merriweather also suggests that the content of the text messages—almost all of which involved drug deals—cannot be evidence of his participation in any conspiracy since they all come after the end date of the conspiracy listed in the indictment.  But neither the law nor logic compels this conclusion.   To the contrary, the fact that Merriweather was arranging drug transactions after October 1 tends to make it more likely that he was engaged in the same prior to October 1, especially since these conversations paint a picture of a man who is a seasoned veteran in the drug trade.  That these exchanges came after the end date listed in the indictment might diminish their evidentiary value, but it by no means destroys it.  The jury was free to weigh that evidence as it wished.

Finally, Merriweather says the call records indicating that Merriweather and Montgomery called each other 301 times during a five-month span in 2015 is not evidence of a conspiracy between the two men since there is a benign explanation for the calls: Merriweather and Montgomery are related.  Merriweather's argument flows from an audacious premise—that a defendant merely offering an alternative explanation for circumstantial evidence precludes a jury from relying on that evidence.  We can find no support for this theory, and Merriweather cites no case to buttress his argument.   In any event, the jury heard Merriweather's alternative explanation for the phone calls; Merriweather's counsel argued this exact point in his closing

---

[4] Merriweather argues that because these text messages were sent after the end date of the conspiracy provided in the indictment, they cannot be taken as evidence of his participation in the conspiracy.  Even assuming that is true—it is not clear why any text message coming after October 1 cannot speak to what Merriweather did before October 1—the post-October 1 text messages can certainly still be used to identify the owner of the cell phone.

argument. It was up to the jury then—not this court now—how to weigh that particular piece of evidence. *Taylor*, 800 F.3d at 711.

Taking a step back from Merriweather's individual challenges and "viewing the record as a whole," his convictions were "supported by substantial and competent evidence." *Taylor*, 800 F.3d at 711.

### B.      Charles Reeves III

Reeves brings a *Brady* claim and a smattering of sentencing challenges. For the reasons that follow, we affirm.

#### 1.      Brady Claim

Reeves pled guilty to being a felon in possession of a firearm. The district court accepted Reeves's guilty plea on October 11, 2016.[5] Reeves was sentenced on January 4, 2017. Between the acceptance of his plea and his sentencing, however, Anthony Seay—the criminal informant who purchased the rifle from Reeves and who likely would have featured prominently in any trial involving Reeves—died. Because the government did not inform Reeves of Seay's death before sentencing, he urges us to set aside his conviction and sentence. Reeves's argument goes as follows: (1) Seay's death constituted exculpatory information, which the government was required to disclose under *Brady v. Maryland*, 373 U.S. 83, 83 (1963); (2) had the government

---

[5] Reeves suggests his plea was not accepted at this October hearing but instead at his January sentencing. Reeves is mistaken. The transcript of the October proceeding clearly reflects that the court accepted his plea then. R. 300, Tr., PID 3038-39 (finding that Reeves committed the offense charged, that he "entered his plea voluntarily, with full knowledge of the facts" and stating that "the plea of guilty is accepted"). That fact that the court at sentencing asked Reeves whether he believed he should be permitted to withdraw his plea does not change that. *See* R. 296, Sentencing Hr'g Tr., PID 2951.

informed him of Seay's death, he would have moved to withdraw his plea; and (3) the court would have granted his motion to withdraw his plea.[6]

For Reeves's claim to get off the ground, then, he has to show that Seay's death gave rise to a disclosure obligation under *Brady*. Because we hold that the government's failure to disclose the fact of Seay's death does not rise to the level of a *Brady* violation, we end our analysis there.

*Brady* held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. A *Brady* violation occurs if three conditions are met: (1) The evidence "must be favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) the evidence "must have been suppressed by the State," willfully or accidentally; and (3) "prejudice must have ensued." *United States v. Tavera*, 719 F.3d 705, 710 (6th Cir. 2013) (quoting *Strickler v. Greene*, 527 U.S. 263, 282 (1999)).

Reeves's challenge falters on the first element. Exculpatory evidence is that which would "undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). Impeachment evidence is that which impacts witness credibility, especially where such credibility is "determinative of guilt or innocence." *Giglio v. United States*, 405 U.S. 150, 154 (1972). The fact of Seay's death was not exculpatory given that it had no bearing on whether

---

[6] Confusingly, Reeves seems to meld this *Brady* claim with another, different *Brady* claim under *Brady v. United States*, 397 U.S. 742 (1970), that his plea was not entered into knowingly because he did not know of Seay's death. This does not deserve serious consideration, though, since Seay was alive when Reeves entered his plea. That is, the "fact" Reeves says he needed to know when he entered his plea had not yet become reality. Furthermore, it is not even clear that, had Seay died before Reeves entered his plea, Reeves would have been entitled to that information.

Reeves committed the crime at all. Nor was Seay's death impeaching, as it did not undermine the credibility of some witness or the reliability of some evidence critical the case. To the contrary, the best evidence that Reeves committed the charged offense remained the video of him selling Seay the rifle. Reeves tries to morph Seay's death into exculpatory "evidence" by arguing that his death would have made it impossible for the prosecution to authenticate and admit the video in a hypothetical trial. But this argument fails. Our cases make plain that the police officers who orchestrated the controlled buy could authenticate the recording. *See, e.g.*, *United States v. Sexton*, 119 F. App'x 735, 742 (6th Cir. 2005), *rev'd on other grounds*. It may be true, the government admits, that its case "would probably have been stronger if Seay were available to narrate the events depicted in the recording." But information that would cause Reeves to "misapprehend[] the quality of the State's case," *Brady v. United States*, 397 U.S. 742, 757 (1970), is not the same as information that would exculpate him of the charged crime.

Even were we to find Seay's death somehow constituted exculpatory or impeaching information, we still do not think the prosecution would have been required to disclose it. That is because, at the time the death occurred, Reeves had already chosen to enter, and the court had already accepted, a guilty plea. The court's acceptance of that plea settles the question of guilt. The government's analogy to a situation where a prosecution witness commits a crime after the trial has concluded is instructive. While that crime could be used to impeach the witness, the government would have no *Brady* obligation to disclose it unless the government planned to call the witness at the punishment phase. *United States v. Sanchez*, 251 F.3d 598, 603 (7th Cir. 2001) ("[B]ecause the government cannot suppress evidence that does not exist at the time of the trial, there is no *Brady* violation as claimed by Sanchez."). Just so here: the prosecution cannot be penalized for failing to disclose evidence that did not exist at the time Reeves's entered, and the

court accepted, his guilty plea. And while it is true that *Brady* also requires disclosure of information that is exculpatory or impeaching at the punishment phase, we cannot see how Seay's unavailability as a witness at sentencing would have had any impact on the proceedings, and Reeves does not argue otherwise.

We find our conclusion reinforced by cases suggesting the *Brady* right does not extend to pre-trial plea negotiations at all. The Supreme Court has been clear that the information prosecutors must disclose *at trial* under *Brady v. Maryland* is not necessarily information to which a defendant is entitled *during plea deliberations* under *Brady v. United States*, 397 U.S. 742 (1970). In *United States v. Ruiz*, 536 U.S. 622 (2002), the Court held that impeachment information that might be subject to *Brady*'s disclosure rule at trial need not be disclosed to render a plea knowing and voluntary. That was because "impeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary*." *Id.* at 629. Though acknowledging that more information would allow a defendant to make a "wiser" decision, the Court stated that the "Constitution does not require the prosecutor to share all useful information with the defendant." *Id.* To be sure, *Ruiz* does not conclusively foreclose Reeves's argument here, since *Ruiz* explicitly addressed only impeachment (not exculpatory) evidence. *Robertson v. Lucas*, 753 F.3d 606, 621 (6th Cir. 2014) ("We have not yet had occasion to determine whether *Ruiz* applies to exculpatory *Brady* material, a question that has caused some disagreement among our sister circuits."). In any event, we need not decide whether to extend *Brady* protection to the plea-bargaining stage because Seay's death was not *Brady* material in the first place.

### 2.      Sentencing Challenges

Reeves says the district court committed four errors at his sentencing.  In the order we address them, he claims that the court (1) wrongly concluded that a 1993 conviction qualified as a predicate "controlled substance offense" under the Guidelines, (2) should have granted him a minimal participant reduction, (3) improperly counted two convictions, rather than just one of them, when calculating his offense level since he was sentenced for both convictions simultaneously, and (4) imposed a substantively unreasonable sentence.

*1993 Conviction and the Guidelines*.  The United States Sentencing Guidelines impose a Base Offense Level of 24 "if the defendant committed any part of the instant offense subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense."  U.S.S.G. § 2K2.1(a)(2).  A "controlled substance offense" is defined by the Guidelines in relevant part as "the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense."  U.S.S.G. § 4B1.2(b).  The question presented by Reeves's first sentencing challenge is whether his 1993 conviction for "possess[ing] a controlled substance with intent to manufacture, deliver or sell the controlled substance," in violation of Tenn. Code Ann. § 39-17-417, counts as a "controlled substance offense" within the meaning of the Guidelines.

The district court said that it did, and taken together with a 1997 robbery conviction, assessed Reeves's Base Offense Level at 24, consistent with U.S.S.G. § 2K2.1(a)(2).  Reeves says the district court got it wrong because Tennessee's definition of what constitutes a "controlled substance" is broader than the Guidelines' definition.  In other words, one could be convicted under Tenn. Code Ann. § 39-17-417 without necessarily having committed a "controlled substance offense" as that term is defined by the Guidelines.  His argument hinges on

the fact that Tennessee defines a "controlled substance" as "a drug, substance, or *immediate precursor* in Schedules I through VII [of the Code]," Tenn. Code Ann. § 39-17-402 (emphasis added), while the Guidelines' definition of a controlled substance offense does not include the "immediate precursor" language. Therefore, according to Reeves, the Tennessee Code and the Guidelines are not a categorical match. *See Mathis v. United States*, 136 S. Ct. 2243 (2016). The government claims Reeves forfeited this argument, urges us to review only for plain error, and cites two prior unpublished decisions in this Circuit that have already said Reeves's offense of conviction and the Guidelines' "controlled substance" provision are a categorical match— meaning any error that occurred here could not have been "plain."

We agree with the government. First, the government is correct that plain-error review should apply to this particular claim. In reviewing the sentencing hearing transcript, while Reeves does object to the Base Offense Level recommendation of 24 in the presentence report, nowhere does he argue his 1993 conviction was not a categorical match with the Guidelines. Nor does he give any reason in his reply brief why the government's request for plain-error review is misguided. When the defendant fails to press an argument at sentencing, and when the government requests plain-error review on appeal, we ordinarily apply that more stringent standard. *United States v. Rodriguez*, 664 F.3d 1032, 1035 (6th Cir. 2011). We follow that general rule today. That means that Reeves "must show (1) there is error; (2) the error was clear or obvious rather than subject to reasonable dispute; (3) it affected the defendant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) it seriously affected the fairness, integrity or public reputation of judicial proceedings." *United States v. Massey*, 663 F.3d 852, 856 (6th Cir. 2011) (internal quotation marks omitted).

Reeves cannot carry that heavy burden. As the government avers, Reeves fails on the second element given the existence of Sixth Circuit cases holding precisely the opposite of what he argues in this case. *See United States v. Douglas*, 563 F. App'x 371, 378 (6th Cir. 2014); *United States v. Alexander*, 686 F. App'x 326, 327-28 (6th Cir. 2017). Granted, those cases do not, as Reeves's argument does, focus as narrowly on the definition of what counts as a controlled substance. *Douglas*, for instance, dealt more precisely with the question whether the Guidelines' "manufacture, import, export, distribute, or dispense" language was so different from Tennessee's "manufacture, deliver or sell" language that a conviction for the latter would not categorically qualify as a "controlled substance offense" under the former. 563 F. App'x at 377. But that distinction only helps Reeves so much. *Douglas* still held, in no uncertain terms, that "Section 39-17-417 is a categorical controlled substance offense." *Id.* In light of *Douglas*, whatever error the district court committed was "not so plain that the trial judge . . . was derelict in countenancing it." *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc) (internal quotation marks and brackets omitted). Reeves's first challenge therefore fails.

*Minimal Participant Reduction.* Reeves's next argument is one that he made in the district court. He contends that the district court should have granted him a minimal participant reduction under U.S.S.G. § 3B1.2 for his role in the firearm sale that underpinned his felon-in-possession guilty plea. Had Reeves convinced the district court he was a "minimal" participant, he would have earned a four-point reduction; if deemed a "minor" participant, a two-point discount. As a fact-bound determination, we "review a district court's denial of a mitigating role adjustment to a defendant's offense level for clear error." *United States v. Salgado*, 250 F.3d 438, 458 (6th Cir. 2001).

The district court committed no clear error in denying Reeves the requested reduction. Reeves's theory goes like this: because the rifle he sold to the CI was never actually in his physical possession, but only in the trunk of a car parked in his backyard, and because the CI was directed to Reeves's home to purchase the rifle by Montgomery, his involvement in the felon-in-possession offense was minimal.[7] But the downward departure Reeves seeks applies only to a defendant "who plays a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity." U.S.S.G. § 3B1.2, Application Note 3(A). That means we must assess Reeves's role relative to others in the offense. When we do so, it is impossible to say that Reeves was "substantially less culpable than the average participant." *Id.* While Montgomery directed the CI to Reeves's home to execute the sale, Reeves carried out every other critical part of the offense underlying his conviction. He kept the gun concealed in the trunk of a car in his backyard; he negotiated the sale price of the gun; he took the CI to the gun; and he took the CI's money in exchange for the gun. The fact that Reeves carried out the most essential parts of the transaction and appeared to exercise some discretion doing so casts doubt on his claim to deserve a minimal or minor participant reduction. *See* § 3B1.2, Application Note (C) (listing factors that guide minimal participant analysis). To the contrary, these facts suggest that Reeves owned the gun and had control over it—in other words, that he was a felon in possession of a firearm. Reeves admits as much in his reply brief. Reeves's Reply Br. at 2 ("[R]eeves's only criminal culpability in this matter was having been in possession of a gun under circumstances in which he was prohibited from doing so . . . .").

---

[7] Reeves also suggests he was a minimal participant in the larger drug conspiracy that is the dominant criminal enterprise in this case. This confuses our inquiry. The minimal participant analysis is specific to *Reeves's* offense—felon in possession of a firearm—not the broader conspiracy which he is not alleged to be a part of.

Accordingly, the district court committed no clear error in denying Reeves a minimal or minor participant reduction.

*Double Counting*.  Reeves also asserts that, while the district court could cite either his 1993 or his 1997 conviction as the basis for adding three criminal history points under U.S.S.G. § 4A1.1(a), it could not add three points for each conviction.

We admit to some difficulty discerning the particulars of Reeves's argument.  He appears to alternately argue three different things.  One theory—the one Reeves pressed in the district court—is that the sentences he received for each conviction should be treated as a single sentence since they were *imposed* on the same day in 1997.  R. 248, Ex. 1, Response to PSR, PID 2120-21 (citing U.S.S.G. § 4A1.2(a)(2)).  Another tack—the one Reeves emphasizes before us—is that because his probation for both sentences was simultaneously *revoked* in 1999, the district court can use only one of the two sentences in computing Reeves's criminal history.  Reeves's Br. at 17 (citing U.S.S.G. § 4A1.2, Application Note 11).  Finally, Reeves ventures a general staleness argument—that because he did not serve any of his 1993 sentence within the last 15 years of his arrest for the instant offense, it is outside the applicable time period the district court can permissibly consider**.**  Reeves's Br. at 18 (citing U.S.S.G. § 4A1.2(e)).  The first argument was adequately addressed and appropriately dismissed by the presentence report; the last is easily answered by the fact that Reeves served time for his 1993 sentence into 2004, well within 15 years of his felon-in-possession conviction at issue here.

That leaves Reeves with his argument that, because his probation for both sentences was revoked simultaneously, only one of those sentences can be the basis for enhancing his criminal history.  It is true that probation for both of Reeves's sentences was revoked on April 15, 1999.  And, according to the Guidelines, "[w]here a revocation applies to multiple sentences, and such

sentences are counted separately under § 4A1.2(a)(2)," courts should "add the term of imprisonment imposed upon revocation to *the* sentence that will result in the greatest increase in criminal history points." § 4A1.2, Application Note 11 (emphasis added). Reeves contends that this means the government can add the term of imprisonment imposed upon revocation to only one of his sentences in calculating his criminal history. If he is right, that means just one of his sentences would move from one criminal history point—what a purely probationary sentence is worth—to three criminal history points—what a sentence imposing a term of imprisonment for more than one year earns. U.S.S.G. § 4A1.1.

Our analysis of this intricate issue starts with a closer look at the Guidelines. Application Note 11 clarifies the operation of § 4A1.2(k). That provision explains how a sentencing court should account for additional sentences imposed upon the revocation of probation. When dealing with the prior revocation of probation on a single sentence, a court should simply "add the original term of imprisonment to any term of imprisonment imposed upon revocation" to determine the appropriate criminal history category. § 4A1.2(k). Seems easy enough, but examples help. Consider a defendant sentenced to six months of imprisonment for a prior offense; that sentence earns him two criminal history points. § 4A1.1(b). Now consider another defendant sentenced to one month of imprisonment, followed by three months of probation, but who flubs the terms of his probation and receives an additional two months in jail. Here is where § 4A1.2(k) kicks in and tells courts that the two months should be added to the initial one month prison sentence to determine his criminal history points (two, because his sentence is at least 60 days but is less than a year, a month, and a day). § 4A1.1.

But what if a defendant had his probation revoked on two separate sentences, and a subsequent prison sentence imposed, at the same time? We know that the sentence imposed

could fairly be added to only one of the sentences, not both, but how are courts to pick? Enter Application Note 11. It instructs courts that any term of imprisonment imposed on revocation should be added to the sentence that "will result in the greatest increase in criminal history points." § 4A1.2, Application Note 11. If a defendant has one prior sentence for 15 days of imprisonment, plus probation, and another is a purely probationary sentence, and if a court imposes an additional 45 days of imprisonment, then the 45 days must be applied to the former. *Id.* Why? Because doing so would "result in the greatest increase in criminal history points"—moving the 15-day-plus-probation sentence from a one-point enhancement under § 4A1.1(c) to a two-point increase under § 4A1.1(b).

Applied here, Reeves argues that means only one of his purely probationary sentences could be transformed from a one-point criminal history bump into a three-point increase. Reeves was probably correct—up until 2006. But while it is true that Reeves's *probation* on both sentences was once simultaneously revoked, Reeves's *parole* in the robbery case alone was revoked (in June 2006), almost a year after his sentence for the 1993 drug conviction expired (in July of 2005). And the Guidelines appear to draw no distinction between revocations of probation and revocations of parole. § 4A1.2(k) (listing together "prior revocation of probation, parole, supervised release, special parole, or mandatory release"). That parole revocation triggered yet another term of imprisonment, this time some 11 months. From that point on, according to § 4A1.2(k)(1), a sentencing court must account for the term of imprisonment imposed on Reeves for the robbery charge—four years, six months—and assign him three additional criminal history points.

Counting both convictions as three-point offenses is also consistent with Application Note 11's counsel that the sentence imposed at the joint 1999 revocation should be allocated to

whatever sentence will allow for the highest criminal history calculation. By tacking the 1999 probation-revocation sentence onto the drug charge, the district court can then tack on the 2006 parole-revocation sentence to the robbery charge. Both initially "straight" probationary sentences thereby become multi-year terms of imprisonment and three-point criminal history offenses. A harsh result for Reeves, it is nevertheless the one contemplated by the Guidelines. The district court therefore did not err by attributing three criminal history points to each sentence.

*Substantive Reasonableness*. Reeves argues last that his 60-month sentence was substantively unreasonable. Reeves specifically criticizes the district court for its "overstatement of his criminal history." He claims that his felony convictions were too remote, and that his other transgressions simply too minor, to justify the five-year sentence he received.

Two elements governing our review of Reeves's claim make this a tough hill for him to climb. The first is that we review the substantive reasonableness of a sentence only for an abuse of discretion. *United States v. Houston*, 529 F.3d 743, 755 (6th Cir. 2008). That means we review the sentence "in light of the totality of the circumstances, giving 'due deference' to the sentencing judge, in recognition of his greater familiarity with the case, his superior position to find facts and assess credibility, and the institutional advantage that comes with frequent sentencing of offenders." *Id.* (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007). The second is that, despite the general rule that only within-Guidelines sentences are entitled to a presumption of reasonableness, "simple logic compels the conclusion that" a defendant challenging a sentence *more* lenient than the Guidelines recommend has an "even more demanding" task than challenging a within-Guidelines sentence. *United States v. Curry*, 536 F.3d 571, 573 (6th Cir. 2008).

Reeves cannot overcome these obstacles. A court imposing a sentence must "consider the defendant's guideline range; the nature of the offense; the characteristics of the defendant; the need to deter criminal conduct, protect the public, and provide the defendant with appropriate treatment; and the need to avoid sentencing disparities with defendants who have been found guilty of the same conduct and who have similar criminal histories." *Id.* at 573-74 (citing 18 U.S.C. § 3553(a)). Consideration of Reeves's five-year sentence in light of these factors reveals no abuse of discretion. Reeves was a two-time felon who had time and again failed to comply with the terms of probation and parole. While the conduct underpinning Reeves's older drug and robbery convictions is not particularly heinous, it is nothing to sniff at. Reeves has also proven resistant to rehabilitation, evidenced by his consistent run-ins with the law, regardless whether a conviction has resulted. Finally, his criminal association with another defendant in this case—coordinating with Montgomery in an illegal gun sale—is yet another testament to the likelihood of recidivism, even at his advanced age.

Reeves nevertheless claims that the district court did not give due attention to his "positive characteristics," some of which were highlighted in a supplemental filing that the judge said he "glanced over" yet hadn't "studied." But right after the judge said that, he invited Reeves to detail what was in that filing, and later asked Reeves whether that exchange allowed Reeves to adequately explain himself. Reeves said yes. Reeves was heard, and indeed, it was likely those mitigating circumstances that led the judge to impose a *below-Guidelines* sentence.

Reeve's sentence was not substantively unreasonable.

### C.    Lloyd Montgomery

Montgomery attacks his sentence in four ways. The first three challenges all go to the district court's calculation of his Guidelines range; the last alleges the sentence violated the Sixth

Amendment. First, Montgomery says the district court failed to make required factual findings to support its conclusion that he was responsible for all the drugs sold in the conspiracy. Second, he claims the district court erroneously applied a leadership enhancement. Third, he argues the district court wrongly concluded he was a career offender under the Guidelines. Fourth and finally, Montgomery claims that the district court violated his Sixth Amendment rights by making new factual findings at sentencing. We take these issues in turn.

*Factual Findings on Drug Amount.* Montgomery first claims that the district court mistakenly calculated the quantity of drugs for which he was responsible. In calculating the drug quantity for which a conspirator is responsible, the Guidelines instruct courts to consider his own acts and "all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(A)-(B). Before holding a defendant liable for the acts of his co-conspirators, a district court must also make "particularized findings with respect to both [1] the scope of the defendant's agreement and [2] the foreseeability of his co-conspirators' conduct." *United States v. Campbell*, 279 F.3d 392, 400 (6th Cir. 2002). Montgomery says the district court failed to meet *Campbell*'s procedural requirements.

We agree. The court struggled with the scope of the conspiracy, repeatedly expressing reservations about the government's 10,000-pill estimate. Eventually, the court arrived at a 5,000-pill estimate, noting that it could "make this finding at least by a preponderance of the evidence, and I'd probably say beyond a reasonable doubt." The court held Montgomery responsible for all 5,000 pills in the conspiracy, noting there was "no doubt that Mr. Montgomery was extensively involved and was a leader in this drug conspiracy." But what the

district court failed to do, and what *Campbell*'s fist element requires, is explain why it concluded that the conspiracy involved 5,000 pills.

Perhaps fearing the court had been too taciturn in explaining its 5,000-pill determination, the government prompted the court to provide "a little more specificity" to "make sure the record is clear for appellate purposes."  The following exchange occurred:

THE COURT:     Well, specificity is I'm recalling the testimony of the two witnesses and all the other testimony and the factors that you've mentioned.  I've considered your calculations.

As far as going by each witness and each day and figuring out exactly how many pills, I can't do that, but I think that 5,000 is a good conservative estimate based on the continuing activity, and that's as specific as I can get.

PROSECUTOR:    Thank you, Your Honor.  I guess the last thing I'd say is— and this goes to that issue.  The text message evidence is really important here because it makes clear the nature of this situation, the other people that Mr. Merriweather and Mr. Montgomery was in touch with and the extent to which people would call all hours of the night to get prescription pills.

THE COURT:     I agree.

*Id.* **at PID 2941-42**.  The government's plea for a more thorough explanation did not have the desired effect.  All it yielded was that the judge based his 5,000-pill determination on the conspiracy's "continuing activity."  And this hazy generality is hardly augmented by the judge's two-word agreement with the government's follow-up argument that drug sales occurred "all hours of the night."  These are not the sort of "particularized findings" on the conspiracy's scope that *Campbell* requires.  279 F. 3d at 400.

Though no case is perfectly on all fours with this one, *United States v. Springs*, 105 F. App'x 811 (6th Cir. 2004), *vacated on other grounds*, 544 U.S. 1058 (2005), comes close

enough. There, we considered whether a sentencing court satisfied *Campbell*'s first requirement by stating:

> This morning the Court has heard evidence. The only evidence presented was the testimony of [an IRS Agent]. Based upon the contents of the factual basis and the testimony of [the Agent], the Court makes a finding that the presentence reports are accurate with respect to the quantities of drugs and money you should be attributed to.

*Id.* at 815 (quoting district court). The panel split on the case's ultimate outcome but was unanimous that this alone would ordinarily fail *Campbell*'s first prong. Writing for the majority, Judge Sutton said: "While the district court specifically found that the drug amounts calculated in the presentence report were supported by the evidence and while Agent Barker provided ample support for that conclusion as well as the answers to the two *Campbell* inquiries, the district court did not completely close this loop." *Id.* The dissent by Judge Moore, meanwhile, described the Agent's testimony as "vague" and the district court's statement as "conclusory"; even taking them together, she concluded the court fell well short of *Campbell*'s "particularized finding" requirement. *Id.* at 820-21. The sentencing judge in *Springs* and in this case proceeded in much the same way—alluding generally to the government's calculations and supporting testimony and then simply landing on a figure that was entirely attributable to a single defendant. While the *Springs* majority thought the *Campbell* shortcoming was mitigated by the defendant's failure to provide contrary evidence (and also that any error was harmless), *id.* at 815-17, Montgomery did provide specific evidence to undermine the government's estimate and argued for a substantially lower drug quantity determination, s*ee, e.g.*, R. 295, Sentencing Hr'g Tr., PID 2928 (contradicting testimony that Montgomery sold pills every day of the week and that he met buyer-witness several years ago); *id.* at PID 2931 (emphasizing that controlled buys only involved 22 total pills).

Let us be clear, though: we do not mean to say the record here could not support a 5,000-pill determination. We hold only that *Campbell*'s procedural requirement—that the judge make factual findings on the scope of the conspiracy, and here that means the scope of the drug activity involved—has not been satisfied. On remand, the judge is free to rely on the testimony of Seay and Poindexter and the reasoning underpinning the government's 10,000-pill calculation in making his own factual findings on the conspiracy's scope.[8] But merely gesturing toward that information is not enough. Rather, the court must explain, with "particularized findings," why the 5,000-pill determination is a reasonable one. Because the district court did not do so, we must vacate Montgomery's sentence.

*Leadership Enhancement*. Montgomery argues that the district court erred by failing to make specific factual findings regarding Montgomery's leadership role in the conspiracy. A district court's decision whether to apply an aggravating role enhancement is "deferential," owing to "the factual nuances" involved in the question. *United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013).

The Guidelines provide for a two-level enhancement "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity." U.S.S.G. § 3B1.1(c). To qualify as an organizer or leader, "a defendant must have exerted control over at least one individual within a criminal organization for the enhancement of § 3B1.1 to be warranted." *United States v. Gort-Didonato*, 109 F.3d 318, 321 (6th Cir. 1997). Courts should consider several factors in deciding whether to apply the enhancement, including whether the defendant

---

[8] The government's calculation was an estimate, yes, but not one born out of thin air: the presentence report suggested the figure—an average of 10 pills per day for the duration of the conspiracy—based on the Seay and Poindexter testimony, the fact that Montgomery had sold 24 pills to Seay in the 11 controlled purchases, and the cell phone evidence showing frequent drug-related communications by the three conspirators.

exercised decision-making authority, the recruitment of accomplices, the right to a larger share of the crime's profits, whether the defendant organized or planned the offense, and the general degree of control the defendant exercised. U.S.S.G. § 3B1.1(c), Application Note 4. Before applying the enhancement, we have required courts to make specific factual findings regarding the defendant's leadership role. *United States v. Kamper*, 748 F.3d 728, 748 (6th Cir. 2014) (court erred by failing to "make a factual finding that [the defendant] managed or supervised other individuals").

Rather than quibble with whether the record would in fact support an organizer or leader enhancement, Montgomery says the court failed to satisfy *Kamper*'s procedural fact-finding requirement. While the record here, especially the facts that emerged in Merriweather's trial, would likely support application of the organizer/leader enhancement, that alone does not satisfy *Kamper*. The court *at sentencing* instead must "make a factual finding" to justify the enhancement. *Kamper*, 748 F.3d at 748. So the government misses the point when it responds to Montgomery's *Kamper* argument by pointing to "testimony presented at Merriweather's trial . . . and the arguments of the government in its pleadings." The government can instead rely only on the factual findings made by the court at Montgomery's sentencing hearing.

Our review of those factual findings confirms they are sparse, but we nevertheless conclude that they suffice under *Kamper*. We think two moments at sentencing are particularly relevant here. First, in discussing its drug quantity determination, the court said there was "no doubt that Mr. Montgomery was extensively involved and was a leader in this drug conspiracy." Second, while addressing Montgomery's objection to the leadership enhancement, the court asked for the government's response. The government stated, "We heard evidence both from Mr. Seay and Poindexter that sort of at bottom Mr. Montgomery was the one who was running

this operation. That's evidenced by the fact that if you would call him and he wasn't at Stacker, he would direct other people to go to Stacker to buy from other people that were there." The court then said, "Based on the testimony, I overrule the defendant's objection on the points in No. 4 and I save the defendant's objection." Because the court said its ruling was based on the testimony just given by the government, we can assume the court adopted that testimony as the basis for applying the enhancement. These two statements provide both the court's conclusion that Montgomery was a leader and the evidence underpinning that conclusion.

Montgomery objects that the government's answer at sentencing stopped short of establishing that Montgomery controlled the other drug dealers at Stacker; it instead only suggested Montgomery controlled the purchasers. But that ignores that that the government's statement "carried with it the clear implication that Montgomery also either tacitly or expressly directed or authorized the persons to whom prospective purchasers would report at Stacker to sell pills as part of the broader conspiracy." It would be strange indeed to assume otherwise—that Montgomery did not exercise some degree of control over the individuals who sold drugs to *Montgomery's* customers, sent there at *Montgomery's* direction, and in *Montgomery's* house. Montgomery counters that even if that were true, the district court cannot satisfy *Kamper*'s "exacting standard" without making that inference explicit on the record. Montgomery in effect suggests we must remand for resentencing any time a district court fails to complete a syllogism even where the premises alone make the conclusion inescapable. That rigid rule is a poor fit with the discretion we must afford sentencing courts in making fact-bound determinations like this one. *Washington*, 715 F.3d at 982. The district court's decision to apply the leadership enhancement is affirmed.

*Career Offender Determination.* Montgomery next challenges the district court's determination that he qualified as a career offender under the Guidelines. He argues that because one of his prior Tennessee convictions is not a qualifying "controlled substance offense" under the Guidelines, he lacked the necessary predicate convictions to qualify as a career offender. Because Montgomery failed to raise this challenge in the district court, plain-error review applies. *Vonner*, 516 F.3d at 385. Montgomery therefore "must show (1) there is error; (2) the error was clear or obvious rather than subject to reasonable dispute; (3) it affected the defendant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) it seriously affected the fairness, integrity or public reputation of judicial proceedings." *United States v. Massey*, 663 F.3d 852, 856 (6th Cir. 2011) (internal quotation marks omitted). Unable to satisfy this stringent test, Montgomery's challenge fails.

Under the Guidelines, a defendant convicted of a crime of violence or controlled substance offense who also has two "prior felony convictions for either a crime of violence or a controlled substance offense" is a career offender. U.S.S.G. § 4B1.1. The district court, relying on Montgomery's four prior drug-related felonies under Tenn. Code Ann. § 39-17-417, found that Montgomery so qualified. Montgomery argues, however, that his convictions under § 39-17-417 cannot be used as career offender predicates because one can be convicted of violating that statute without committing a "controlled substance offense" as defined by the Guidelines. How can this mismatch happen, according to Montgomery? Without getting too far into the weeds—further than plain-error review dictates we need venture—Montgomery argues that Tennessee's law penalizes anyone who possesses a controlled substance with the intent to "administer" it, while the Guidelines capture only possession with the intent to "manufacture, import, export, distribute, or dispense," terms that do not encompass "administer." Because the

Code captures a broader range of conduct than the Guidelines, Montgomery says the Code and Guidelines are not a categorical match.[9]

Montgomery's argument is highly technical and, at times, even elegant. But as we noted when analyzing Reeves's § 39-17-417 categorical approach argument—which we also reviewed only for plain error—this court has consistently "treated a violation of § 39-17-417 as a categorical controlled substance offense." *Douglas*, 563 F. App'x at 377 (citing cases); *Alexander*, 686 F. App'x at 327-28. Given this authority, we cannot say the district court plainly erred by concluding that Montgomery's § 39-17-417 convictions were qualifying career offender predicates.[10]

*Sixth Amendment*. In his final challenge, Montgomery argues that the district judge improperly engaged in judicial fact-finding to increase the quantity of pills for which Montgomery was responsible. **Montgomery's Br. at 29**. This, Montgomery says, amounts to a Sixth Amendment violation. His argument borrows from a three-Justice dissent from the denial of certiorari in *Jones v. United States*, 135 S. Ct. 8 (2014), in which Justice Scalia suggested that where a sentence would be substantively unreasonable absent the court finding additional facts at sentencing, it violates the Sixth Amendment. The government responds that the law in this Circuit permits judicial fact-finding at sentencing. Because Montgomery raises this argument for

---

[9] If this argument sounds familiar, it is because Montgomery's codefendant Reeves made a similar one. The difference, though, is that while Reeves focused on what qualified as a "controlled substance," Montgomery says Tennessee's use of the word "deliver" captures more conduct than the Guidelines' use of "distribute[] or dispense."

[10] In his reply brief, Montgomery insists that these cases may have justified the district court's decision at the time it was made, but that changes in the law render its decision now plain error. While it is true that a trial judge's decision may be correct at the time it is made and yet, based on a change in law, become so clearly wrong as to mandate a finding of plain error on appeal, *Henderson v. United States*, 568 U.S. 266, 274 (2013), this is not such a case. Montgomery's argument is a fine-grained one, and it argues for a *change* in law that we have not yet ordered. The district court did not plainly err *then*, and we cannot say it plainly erred *now*, even after *Mathis*.

the first time on appeal, we review only for plain error. *Vonner*, 516 F.3d at 385. Again, that means we can disturb the district court's judgment only if it committed an "obvious or clear" error. *Id.* at 386.

We find no such error in the district court's drug quantity determination. While it is true that judicial fact-finding that increases a defendant's statutory maximum or mandatory minimum sentence violates the Sixth Amendment, *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), and while it is also true that judicial fact-finding is prohibited if it would increase a defendant's *mandatory* Guideline sentence, *United States v. White*, 551 F.3d 381, 384 (6th Cir. 2008) (en banc), there is no such hard-and-fast rule in the advisory Guidelines context. Rather, "the use of judicial fact-finding in the post-*Booker advisory* guideline sentencing scheme is not prohibited by the Sixth Amendment, assuming the resulting sentence does not exceed the statutory maximum." *United States v. Bonick*, No. 16-6388, 2017 WL 4511490, at *5 (6th Cir. Oct. 10, 2017) (citing *White*, 551 F.3d at 384). Montgomery's advisory Guidelines range was increased by virtue of the district court's drug quantity determination, but that did not mandate any particular sentence, and his resulting sentence did not exceed any statutory maximum. Doing what we have expressly condoned in this Circuit can hardly be said to constitute plain error.

Nor can Montgomery show plain error by pointing to separate writings by some members of the Supreme Court arguing that a sentence might be substantively unreasonable where it would be "reasonable only because of the existence of judge-found facts." *See, e.g.*, *Rita v. United States*, 551 U.S. 338, 374 (2007) (Scalia, J., concurring). The fact remains that "neither a majority of the Supreme Court nor a majority of this court has recognized an as-applied Sixth Amendment challenge." *Bonick*, 2017 WL 4511490, at *6. Therefore, as in *Bonick*, "even if we

were to find an error, it could not be said to be 'obvious or clear.'" *Id.* (quoting *Vonner*, 516 F.3d at 386).[11]

### D.    Dominique Lucas

Lucas raises two challenges to his sentence, one procedural and one substantive. First, he says the district court failed to provide an adequate explanation for his 180-month sentence. And second, he says his below-Guidelines sentence was substantively unreasonable. For the reasons that follow, we agree with Lucas's first claim and need not reach the second.

*Explanation of the Sentence.* Lucas maintains that the district court abdicated its duty to explain Lucas's sentence under 18 U.S.C. § 3553(c), which requires sentencing courts to "state in open court the reasons for its imposition of the particular sentence."

The standard of review is yet again a matter of dispute. The government asks us to review this claim only for plain error, on the theory that Lucas forfeited his challenge to the court's explanation of the sentence when he said he had no "objections to the form of the sentence." **R. 292, Sentencing Hr'g Tr., PID 2818**. Lucas responds that the district court's "form-of-the-sentence" question was so ambiguous that he did not take the district court to be asking for any final objections, as it is required to do under *United States v. Bostic*, 371 F.3d 865, 872 (6th Cir. 2004). Lucas further directs us to later in the hearing, when the judge asks, "Is there anything else we need to attend to?" and he responds, "Your Honor, I do. In light of the fact that Mr. Lucas may want to appeal, I think I am obligated to ask the Court to specifically

---

[11] We also find persuasive the government's argument that this case presents a poor vehicle for this sort of challenge. Montgomery pled guilty; he never went to trial, he was not acquitted of certain charges, and he was not sentenced on the basis of that acquitted conduct. That was the factual context that precipitated Justice Scalia's dissent-from-denial in *Jones v. United States*, 135 S. Ct. 8 (2014), and the context that led to Judge Moore's thoughtful concurrence in *United States v. Conatser*, 514 F.3d 508, 530 (6th Cir. 2008), but it is far afield from the factual context of this case.

address the 3553(a)(2) factors." **R. 292, Sentencing Hr'g Tr., PID 2820-21**. That exchange, Lucas says, proves he misunderstood the judge's earlier question, and that he got his objection on the record before the sentencing court. We think Lucas is right. We therefore review the district court for an abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007).

18 U.S.C. § 3553(a)(2) mandates that any sentence imposed reflect the seriousness of the offense, afford adequate deterrence, protect the public, and provide the defendant with appropriate rehabilitation. Under § 3553(c), a court must, "at the time of sentencing . . . state in open court the reasons for its imposition of the particular sentence." While this means a court must "explain the factors that justify the sentence imposed," *United States v. Smith*, 474 F.3d 888, 894 (6th Cir. 2007), it need not "engage in a ritualistic incantation of the § 3553(a) factors it considers," *United States v. Chandler*, 419 F.3d 484, 488 (6th Cir. 2005).

Section 3553(c)'s procedural requirement is not onerous. A "sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." *Rita v. United States*, 551 U.S. 338, 356 (2007). Appellate review of compliance with § 3553(c) is accordingly deferential. In determining whether the sentencing judge has adequately explained his sentence, we examine the record as a whole, not isolated statements during the sentencing hearing. *Rita*, 551 U.S. at 359. "Where . . . the record makes clear that the sentencing judge considered the evidence and arguments," a judge need not "write more extensively." *Id*. And when "a defendant raises a particular argument in seeking a lower sentence, the record must reflect both that the district judge considered the defendant's argument and that the judge explained the basis for rejecting it." *United States v. Jones*, 489 F.3d 243, 251 (6th Cir. 2007) (citation omitted).

Yet even applying this relaxed review, we think the district court fell short. The record reveals that the judge failed to give due consideration to Lucas's § 3553-based arguments and to adequately explain his reasons for rejecting them, and that he failed to justify his sentence by reference to the § 3553(a) factors. Even when we examine the record holistically to determine whether the judge sufficiently "considered the evidence and arguments," *Rita*, 551 U.S. at 359, we cannot condone the proceedings here. To be sure, the record does reveal some evidence that the court at least *considered* each of Lucas's arguments for a lower sentence. Four points in the hearing suggest this. First, the judge addressed all of Lucas's pre-sentence objections during the hearing. Second, the judge listened to testimony from a psychologist that related to Lucas's § 3553 mitigation arguments. Third, the judge heard both Lucas's arguments emphasizing the § 3553 factors and the government's response. And fourth, the judge averred multiple times that he read all of the arguments contained in Lucas's sentencing memorandum and related filings. This is a promising start. Had the court buttressed this process with a contemporaneous explanation for why it was imposing the chosen sentence—with at least some reference to the § 3553 factors—we might well reach a different outcome today.

But the court did not do so, and so we must order a remand for resentencing. Section 3553(c) and this court's cases make clear that a sentencing court cannot merely take into account the § 3553(a) factors and the defendant's arguments related thereto. The court must go one step further and explain its sentence, including its reasons for rejecting the defendant's arguments. *See, e.g.*, *Jones*, 489 F.3d at 251; *United States v. Thomas*, 498 F.3d 336, 341 (6th Cir. 2007). Here, while we assume that the "experienced and learned trial judge was aware that the sentencing guidelines were advisory and that the factors enumerated in section 3553(a) were to guide [his] discretion . . . we are unable to point to anything in the record"—beyond the 8-month

downward variance—"to confirm our surmise." *United States v. Johnson*, 488 F.3d 690, 700 (6th Cir. 2007). Nowhere does the court explain how the chosen 180-month sentence serves the § 3553(a) interests. And at no time did the court address Lucas's arguments for a substantial downward variance from the Guidelines range—including arguments relating to Lucas's difficult childhood, his mental health issues, the non-violent nature of his crime, the government's alleged misuse of a § 851 enhancement, and his alleged minor role in a relatively small-scale conspiracy.

Instead, we find only three rote recitations that the court has considered the § 3553(a) factors and based its decision on them. Those attestations alone cannot be enough. Nor does the judge's single-paragraph prelude to the sentence change the analysis. While he lamented that the persistent drug problem "leaves me with a very unquiet mind," he admitted in the very next sentence that this has no bearing on the 180-month sentence he is about to impose: "But I guess that's neither here nor there with respect to this particular case." What is more, although a sentencing court need not "engage in a ritualistic incantation of" the § 3553(a) factors it considers," *Chandler*, 419 F.3d at 488, it is nevertheless revealing that the court did not *once* use the words deterrence, safety, or rehabilitation. It will be rare indeed when an explanation for a sentence will "reflect the considerations listed" in § 3553(a) without even making reference to the considerations embodied therein. *See id.* Thus unable to "find any discussion of the reasons for which the district court chose the sentence it settled upon," *Johnson*, 488 F.3d at 700, we vacate Lucas's sentence and remand for resentencing.

## III

For these reasons we **AFFIRM** the judgments with respect to Brian Merriweather and Charles Reeves but **VACATE** the sentences of Lloyd Montgomery and Dominique Lucas and **REMAND** to the district court for resentencing.